## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In Re | ) | Chapter 7 |
| | ) | |
| Christopher Hacker asf Source Lending Corporation, | ) ) | Case No. 09-45742 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| | ) | |
| State of Minnesota, by its Attorney General, Lori Swanson, | ) ) | |
| | ) | |
| Plaintiff and Creditor, | ) | **ADVERSARY COMPLAINT** |
| | ) | No. _____ |
| v. | ) | |
| | ) | |
| Christopher Hacker asf Source Lending Corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF CERTAIN DEBTS

Plaintiff State of Minnesota, by its Attorney General, Lori Swanson ("State")

bring this Adversary Complaint to ask this Court not to discharge certain debts made by

Christopher Hacker asf Source Lending Corporation ("Debtor") to the State in the

underlying petition for relief under Chapter 7 of the United States Bankruptcy Code, 11

U.S.C. § 101 et seq.  The debt owed to the State is nondischargeable under 11 U.S.C.

§§ 523(a)(2), 523(a)(4), 523(a)(6), and/or 523(a)(7).

## INTRODUCTION

1.     The State and Debtor are engaged in litigation in Minnesota state court and have agreed to a Stipulation and Consent Judgment to resolve the state court action ("State Court Stipulation and Consent Judgment").    Debtor has agreed that the obligations under the State Court Stipulation and Consent Judgment are not dischargeable in bankruptcy under 11 U.S.C. § 523 or any other applicable provision.    The State files the instant Adversary Complaint and asks this Court to determine that the Debtor's debt owed to the State is nondischargeable under 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), and/or 523(a)(7).

## JURISDICTION AND VENUE

2.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 523(a) of the Bankruptcy Code, to determine the dischargeability of certain debts.

3.     This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(i).    This action arises under 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), and/or 523(a)(7).

## PARTIES

4.     Lori Swanson, the Attorney General of the State of Minnesota, is authorized under Minn. Stat. Ch. 8, including Minn. Stat. §§ 8.01, 8.31, 8.32, and under §§ 325F.67 and 325F.70, and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens to enforce Minnesota law.

5.      Debtor Hacker, a Minnesota resident, was the owner, sole shareholder, President, and Chief Operating Officer of Source Lending Corporation, a Minnesota mortgage broker.  At all relevant times, Debtor owned and controlled Source Lending and was intimately involved in Source Lending's business, including the hiring, training, and supervision of employees.

## BACKGROUND

### I.    STATE COURT CONSUMER PROTECTION ACTION AGAINST DEBTOR.

6.      On February 13, 2009, the State filed an Amended Complaint in Minnesota state court against Source Lending Corporation and Christopher Hacker.  That case is entitled *State of Minnesota, by its Attorney General, Lori Swanson v. Source Lending Corporation and Christopher Hacker, Individually*, Court File No. 27-CV-08-19803 (Henn. Co. Dist. Ct.).  *See* Exhibit A (Amended Complaint).

7.      The Amended Complaint alleged violations of state consumer fraud, deceptive trade practices, false advertising, and mortgage broker laws.  *See* Exhibit A (Amended Complaint).  The allegations made in the State's Amended Complaint are fully incorporated here.

8.      On October 3, 2011, the State and the Debtor agreed to the State Court Stipulation and Consent Judgment resolving the state court action.  *See* Dkt. 52, Exhibit A (State Court Stipulation and Consent Judgment).  In sum, the State Court Stipulation and Consent Judgment provides injunctive relief; restitution in the amount of $100,000 made payable to the State and distributed to consumer via a claims process; a stayed civil penalty of $100,000; and Debtor's agreement that the obligations under the State Court

Stipulation and Consent Judgment are nondischargeable in bankruptcy under 11 U.S.C. § 523 or any other applicable provision.  *Id.*

9.      On October 20, 2011, the State filed a Motion to Request Modification of the Order dated October 23, 2009 [Dkt. No. 13] to Allow the Hennepin County District Court to Enter Judgment Based on the Terms of the Consent Judgment Reached by the Parties.  *See* Dkt. No. 52.  That motion is currently pending in this Court.

10.     Pursuant to the terms of the State Court Stipulation and Consent Judgment agreed to by the parties, Christopher Hacker and Source Lending will not oppose the State's motion to modify Bankruptcy Court Order Doc. No. 13 to allow the Hennepin County District Court to enter judgment based on the terms of the State Court Stipulation and Consent Judgment reached by the parties.  *See* Dkt. 52, Exhibit A at ¶ 6.2.

11.     Pursuant to the State Court Stipulation and Consent Judgment agreed to by the parties, the State, Christopher Hacker, and Source Lending will jointly file a stipulation and consent judgment regarding the instant Adversary Complaint acknowledging that the debt is nondischargeable under 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), and/or 523(a)(7).

12.     The State files the instant Adversary Complaint and asks this Court to determine that the Debtor's debt owed to the State is nondischargeable under 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), and/or 523(a)(7).

## II.    DEBTOR'S CHAPTER 7 BANKRUPTCY CASE.

13.     On or about August 28, 2009, Debtor filed for Chapter 7 bankruptcy to discharge all debts including those owed to the State.

14.     With this Adversary Complaint, the State respectfully requests that this Court not discharge the debt owed by Debtor to the State under the terms of the State Court Stipulation and Consent Judgment.

15.     The State's Adversary Complaint is timely.  *See* Case No. 09-45742, Dkt. No. 50.

## CLAIMS FOR RELIEF

## COUNT I:  RECOVERY OF DEBT

16.     Plaintiff State restates and incorporates herein by reference the allegations contained in the paragraphs above.

17.     A discharge of debt under Chapter 7 does not discharge an individual debtor from any debt of money, property, or services to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's financial condition.  11 U.S.C. § 523(a)(2)(A).

18.     A discharge of debt under Chapter 7 does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity.  11 U.S.C. § 523(a)(4).

19.     A discharge of debt under Chapter 7 does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity.  11 U.S.C. § 523(a)(6).

20.     A discharge of debt under Chapter 7 does not discharge an individual debtor from any debt to the extent such debt is for a fine, penalty, or forfeiture payable to

and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss. 11 U.S.C. § 523(a)(7).

21.    On October 3, 2011, the State and the Debtor agreed to the State Court Stipulation and Consent Judgment resolving the state court action. *See* Exhibit B.

22.    In sum, the State Court Stipulation and Consent Judgment provides injunctive relief; restitution in the amount of $100,000 made payable to the State and distributed to consumers via a claims process; a stayed civil penalty of $100,000; and Debtor's agreement that the obligations under the Consent Judgment are nondischargeable in bankruptcy under 11 U.S.C. § 523 or any other applicable provision. *Id.*

## PRAYER FOR RELIEF

WHEREFORE, the State respectfully requests that this Court grant judgment as follows:

A.    Declare the Debtor's debt to the State pursuant to the State Court Stipulation and Consent Judgment, when entered by the Hennepin County District Court, is nondischargeable;

B.      Grant such other and further relief to the State as may be just and proper.

Dated:  October 24, 2011                          LORI SWANSON
                                                  Attorney General
                                                  State of Minnesota


                                                  s/Ian Dobson
                                                  IAN DOBSON
                                                  Assistant Attorney General
                                                  Atty. Reg. No. 0386644
                                                  445 Minnesota Street, Suite 1400
                                                  St. Paul, Minnesota 55101-2131
                                                  (651) 757-1432 (Voice)
                                                  (651) 297-7206 (TTY)

                                                  ATTORNEYS FOR CREDITOR


AG: #2705737-v1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In Re:

CHRISTOPHER HACKER,                                          Case No. 09-45742
                                                                          Chapter 7

        Debtor.


## AFFIDAVIT OF IAN DOBSON IN SUPPORT OF STATE OF MINNESOTA'S
## ADVERSARY COMPLAINT

STATE OF MINNESOTA    )
                      ) ss.
COUNTY OF RAMSEY      )

      IAN DOBSON, being duly sworn under oath, states the following:

      1.      I am an Assistant Attorney General in the Office of the Minnesota Attorney General.  I am one of the attorneys for the State of Minnesota in its lawsuit filed against Source Lending Corporation and Christopher Hacker entitled *State of Minnesota, by its Attorney General, Lori Swanson v. Source Lending Corporation and Christopher Hacker, Individually*, Court File No. 27-CV-08-19803, Hennepin County District Court.

      2.      Attached as **Exhibit A** is a true and correct copy of the Amended Complaint filed in *State of Minnesota, by its Attorney General, Lori Swanson v. Source Lending Corporation and Christopher Hacker, Individually*, Court File No. 27-CV-08-19803, Hennepin County District Court.

      FURTHER YOUR AFFIANT SAYETH NOT.

s/Ian Dobson_____
IAN DOBSON


Subscribed and sworn to before me on
this __24th__ day of October, 2011.

s/Donna M. Ackerman_____
NOTARY PUBLIC
My Commission Expires Jan. 31, 2015

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Other Civil
(Consumer Protection)

State of Minnesota, by its Attorney General,
Lori Swanson,

Court File No. 27-CV-08-19803
Judge: Tony N. Leung

Plaintiff,

vs.

**AMENDED COMPLAINT**

Source Lending Corporation, and Christopher
Hacker, Individually,

Defendants.

The State of Minnesota, by its Attorney General, Lori Swanson, for its Amended

Complaint against Source Lending Corporation hereby states and alleges as follows:

## INTRODUCTION

1.     Defendant Source Lending Corporation ("Source Lending") is a Minnesota

mortgage broker that obtains residential mortgage loans for consumers.  Source Lending sold

risky and complex loans to Minnesota consumers, including "Hybrid ARMs" and "Pay Option

ARMs," by employing a multitude of false, misleading, and deceptive acts and practices.  These

unlawful acts and practices include misleading consumers about the terms of the loans; using the

classic "bait-and-switch" technique; and making false promises of serial refinancing.  Source

Lending's unlawful conduct has tarnished the American dream of homeownership for many

Minnesotans.  By its conduct, Source Lending has violated Minnesota's statutory prohibitions

against consumer fraud, deceptive trade practices, and false advertising, as well as Minnesota's

mortgage broker laws.  At all relevant times, Defendant Christopher Hacker owned and

controlled Source Lending and was intimately involved in Source Lending's business, including

1


EXHIBIT
A

the hiring, training, and supervision of employees.   Mr. Hacker participated in, directed, knowingly acquiesced in and/or should have known about Source Lending's unlawful conduct and his actions have caused injury to Minnesota residents.   Mr. Hacker also operated Source Lending without following the required formalities of a corporation.   The State of Minnesota, by its Attorney General, Lori Swanson, brings this consumer protection lawsuit against Source Lending and Mr. Hacker for declaratory and injunctive relief, civil penalties, restitution, costs, reasonable attorneys' fees, and other appropriate relief.

## PARTIES

2.      Lori Swanson, the Attorney General of the State of Minnesota, is authorized under Minn. Stat. Ch. 8, including Minn. Stat. §§ 8.01, 8.31, 8.32, and under §§ 325F.67 and 325F.70, and has common law authority, including *parens patriae* authority, to bring this action on behalf of the State of Minnesota and its citizens to enforce Minnesota law.

3.      Source Lending is a Minnesota corporation registered with the Minnesota Secretary of State.   Source Lending has a registered office located at 3033 Campus Drive #E170, Plymouth, Minnesota 55441.   Source Lending is a mortgage broker.

4.      Christopher Hacker, a Minnesota resident, is the owner, sole shareholder, President, and Chief Operating Officer of Source Lending.   At all relevant times, Mr. Hacker owned and controlled Source Lending and was intimately involved in Source Lending's business, including the hiring, training, and supervision of employees.   Mr. Hacker had knowledge of the unlawful acts and practices described herein and possessed the authority to control such acts and practices. Mr. Hacker had the ability to supervise the unlawful acts and practices described herein and had a financial interest in such acts and practices.   Mr. Hacker participated in, directed, knowingly acquiesced in, and/or should have known about the unlawful

2

acts and practices described herein.  Mr. Hacker, in the alternative, negligently failed to learn of and prevent Source Lending's unlawful acts and practices described herein.

5.      Mr. Hacker is individually liable for the unlawful acts and practices described herein by virtue of, among other things, his ownership, control, involvement, authority, acquiescence, approval, and direction of Source Lending and its acts and practices.  Mr. Hacker is also liable under the responsible corporate officer doctrine by virtue of, among other things, his position of responsibility and influence on corporate policies and activities.  Mr. Hacker is further individually liable for the unlawful acts and practices described herein under the "alter ego" theory of liability by virtue of, among other things, operating Source Lending: without observing corporate formalities; without paying dividends; without allegedly providing sufficient capitalization for purposes of the corporate undertaking; and while Source Lending was allegedly insolvent.

## JURISDICTION

6.      This Court has jurisdiction over the subject matter of this action pursuant to Minn. Stat. §§ 8.01, 8.31, 8.32, subd. 2(a), 325F.67 and 325F.70.

7.      This Court has personal jurisdiction over Source Lending, because Source Lending is a Minnesota corporation, does business in Minnesota, has agents and property in Minnesota, and has committed acts in Minnesota causing injury to Minnesota citizens.

8.      This Court has personal jurisdiction over Mr. Hacker, because Mr. Hacker is a Minnesota resident and had committed acts in Minnesota causing injury to Minnesota citizens.

## VENUE

9.      Venue in Hennepin County is proper under Minn. Stat. § 542.09 (2006) because the Defendants reside, and the cause of action arose, in part, in Hennepin County.

## FACTUAL BACKGROUND

### I.    Source Lending is a Mortgage Broker.

10.    Source Lending is a mortgage broker that obtains residential mortgage loans for consumers.  Source Lending commonly obtains refinancing of existing residential mortgage loans for consumers.

11.    A mortgage broker helps obtain from another person (typically a lender) a residential mortgage loan for a borrower in return for consideration to be paid by the borrower or lender or both.  *See* Minn. Stat. § 58.02, subd. 14 (2006).

12.    A residential mortgage loan is a loan made primarily for personal, family, or household use and secured primarily by a mortgage on residential real property or other ownership interest in residential real property.  *See* Minn. § 58.02, subd. 18 (2006).

13.    Mortgage brokers are typically compensated in two ways.  First, consumers may compensate brokers directly through loan origination, underwriting, processing, and other fees. Second, lenders may compensate brokers by paying them a "broker premium" or "yield spread premium," which is the dollar value of the difference between the lowest interest rate the lender would have accepted and the interest rate the broker actually obtained.  This money is paid to the broker as an incentive to sell loans with higher interest rates.  For example, if a lender will lend money to a borrower for 7 percent interest, but the broker can get the borrower to agree to a loan at 10 percent interest, the lender will pay the broker a premium on the 3 percent difference. Although the borrower is not charged the premium directly, the consumer pays for the premium indirectly by paying a higher interest rate.

## II.   Source Lending Used Aggressive and Deceptive Advertising to Entice Consumers to Refinance Their Loans With Source Lending.

14.     Source Lending sought to induce consumers into refinancing their residential mortgage loans through various types of solicitation.

15.     Source Lending often made initial contact with consumers though particularly aggressive telemarketing.  For example, over a 90 day period, Source Lending called Sharon Booth of Monticello, Minnesota, over a dozen times to try to convince her to set up an appointment to discuss refinancing.  Ms. Booth repeatedly told Source Lending to stop calling her and to take her off of Source Lending's call list, but Source Lending kept calling.  During the summer of 2006, Source Lending called Connie Wilcox of Burnsville, Minnesota, more than two dozen times attempting to convince her to refinance.  Each time Source Lending called, Ms. Wilcox told the Source Lending representative not to call her anymore.  In May, 2005, Source Lending twice called Cathy Zemmels of New Brighton, Minnesota, even though Ms. Zemmels's telephone number was registered on the National and State Do Not Call registries.

16.     Source Lending also maintains an Internet website, http://www.sourcelending.net, where it touts its ability to obtain money-saving loans for any consumer.  For example, Source Lending claimed it could save consumers "more than $200 dollars" on their monthly payments: "9 out of 10 people we talk to can save more than $200 dollars on their current monthly payments."  Source Lending also claimed that its representatives "will always be available to you" and "will explain things in a simple, straight forward way that is easy to understand."  Source Lending also claimed it could obtain a loan "for every situation" and close those loans "fast": "Source Lending has hundreds of loan programs for every situation.  We specialize in fast, hassle free closings."   Source Lending further claimed that it could create a loan program regardless of the consumer's credit: "We can create a loan program that will give you the

payment you want, regardless of your credit situation." Examples of Source Lending's Internet website advertisements are attached as Exhibit A.

17.    In addition, Source Lending sent deceptive and misleading direct mail advertisements to consumers. For example, members of the Twin City Co-ops Federal Credit Union ("Twin City Co-ops") received a mailing that purported to be from Twin City Co-ops, in that the return mailing address stated:

> RE: Twin Cty. Co.-Ops Fcu
> 7100 Northland Circle Suite 103
> Brooklyn Park, MN 55428

The mailing claimed that consumers could:

# Save Money Now!

| | |
|---|---|
| ✓ Lower Monthly Payments<br>✓ Cash-Out for any Reason<br>✓ Consolidate Credit Cards and Other High Interest Loans<br>✓ Loan Programs for Any Situation and Credit Score | ✓ Relieve Stress<br>✓ Learn More About Your Credit<br>✓ Take Control of Your Finances<br>✓ Fast, Efficient, and Convenient<br>✓ We Come to You<br>✓ FREE Proposal |

*8 out of 10 home owners don't know they can save*
*$200 or more every month!*
\*\*\*
*Because you are a previous customer, qualifying is*
*easy - We come to you!*

At the bottom right corner appears Source Lending's name with a telephone number to call "Trevor" and the Internet address "SourceLending.net." But Twin City Co-ops never had a branch office located at 7100 Northland Circle, Suite 103 in Brooklyn Park, and had no association with Source Lending, the telephone number on the bottom of the mailing, or anybody named "Trevor" at Source Lending. Source Lending's mailing was clearly meant to deceive Twin City Co-ops members into thinking the mailing came from Twin City Co-ops and it was

deceptively designed to look as if Twin City Co-ops' members would receive some kind of deal "because you are a previous customer."

18.   · After making initial contact with consumers, Source Lending representatives typically would contact consumers through further telephone calls and in-person meetings at the consumer's home.   During these follow-up calls and meetings, Source Lending's representatives would gain the consumers' trust and confidence.   Exploiting that trust and confidence, Source Lending then used a variety of unlawful acts or practices to sell consumers risky and complex loans.

**III.   Source Lending Engaged in False, Misleading, and Deceptive Acts and Practices In Order to Sell Loans to Borrowers.**

19.   Source Lending engaged in a number of false, misleading, and deceptive practices in order to sell loans to consumers.

20.   Source Lending engaged in these false, misleading, and deceptive practices while acting in the course of its business, vocation, or occupation.   Source Lending's employees and agents also engaged in these false, misleading, and deceptive practices while acting in the course and scope of their employment or agency.

21.   Source Lending obtained substantial fees and premiums by selling loans to consumers though the use of false, deceptive, and misleading acts and practices, including misleading consumers about the terms of the loans; engaging in the classic "bait-and-switch" technique; and making false promises of serial refinancing.

A.   **Source Lending Misled Consumers and Misrepresented the Terms of the Loans.**

22.   Source Lending offered a variety of loan products, including hybrid adjustable rate mortgages ("Hybrid ARMs") and payment option adjustable rate mortgages ("Pay Option ARMs"), without fully disclosing the terms of these risky and complex products to consumers.

1.   **Hybrid ARMs**

23.   Hybrid ARMs typically have an initial low, fixed interest rate for a period of two or three years, and then an adjustable interest rate for the remaining loan term. These loans are commonly referred to as "2/28" ARMs and "3/27" ARMs. These Hybrid ARMs sometimes only require "interest-only" payments during the period that the initial interest rate is in effect.

24.   After the initial interest rate expires, the interest rate can adjust once every six months for the next 28 or 27 years. During this period, the interest rate is determined by adding a margin—usually 5 to 6 percent or higher—to an index. One common index is the "LIBOR" index. The LIBOR ("London Interbank Offered Rate") index is the average of interbank offered rates for one month U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. For example, if the consumer's margin is 5 percent and the LIBOR index is 6 percent, the consumer's new interest rate would be 11 percent.

25.   In addition, after the initial rate expires, the monthly payment can adjust once every six months based on the new interest rate. Because the initial interest rate is set independent of the index, the payment increase can be dramatic, particularly if the loan called for interest-only payments for the first two or three years.

26.   The new monthly payment is often calculated by using a dual amortization period (i.e., the time period over which the loan is scheduled to be paid off). For the first ten years of the loan, the amortization period is typically forty years. For the last twenty years of the loan,

8

the amortization period is typically decreased to twenty years. The monthly payments can increase substantially based on the reduction of the amortization period from forty years to twenty years, even if the interest rate remains the same or decreases.

27.     Some Hybrid ARMs require a lump sum payment at the maturity date, often called a "balloon payment." A balloon payment is required because the payment schedule on the Hybrid ARM will not pay the loan in full by maturity. The balloon payment can be significant, often tens of thousands of dollars or more.

28.     Hybrid ARMs frequently come with significant prepayment penalties. The prepayment penalty can inhibit the consumer's ability to refinance the loan.

29.     Source Lending deceived consumers into refinancing by misleading them about the terms of the Hybrid ARMs. Source Lending emphasized the low initial "fixed" interest rate and low initial monthly payments. Source Lending misrepresented or obfuscated the true terms of these loans, including but not limited to misrepresenting or obfuscating the fact that the interest rates were ultimately adjustable rather than fixed, the fact that the initial payments on some loans only covered the interest and not the principal, the amount by which interest rates and monthly payments could increase once the low initial fixed rate expired, and the true risks of such loans.

30.     Some borrowers subjected to the false, misleading, and deceptive acts and practices described above did not understand the true risks and likely unaffordability of their Hybrid ARMs, because Source Lending arranged for closings where borrowers often had to sign a large stack of closing documents without enough time to review and understand them.

### 2.    Pay Option ARMs

31.    In addition to selling Hybrid ARMs, Source Lending commonly sold the risky and complicated Pay Option ARM to consumers.

32.    Pay Option ARMs typically have a maturity date of 30 years. The first five years of the loan is called the "Initial Period." During the Initial Period, the Pay Option ARM provides a consumer with four different payment options.

33.    The first payment option is the "minimum payment." The minimum payment entices consumers by offering a very low "teaser" rate—often as low as 2 or 3 percent. The teaser rate is not the interest rate, but rather is the "payment rate" that is used to determine the minimum payment. The actual interest rate, which is commonly called the "Initial Stated Interest Rate," usually is much higher than the teaser rate—often 8 percent or higher. Because the minimum payment is calculated based on the teaser rate, the minimum payment is actually less than the interest accruing on the principal balance of the loan at the Initial Stated Interest Rate. The unpaid interest is added to the principal amount of the loan and interest accrues on the balance at the Initial Stated Interest Rate. This results in negative amortization, which means that the principal balance of the loan increases. The amount of the minimum payment is the only amount typically disclosed in the note that the consumer signs at closing.

34.    The second option is a "interest-only" option where the consumer has the option of making an interest-only payment based on the Initial Stated Interest Rate. The dollar amount of interest-only payment is the second lowest payment option presented to the consumer. The amount of the interest-only payment typically is not disclosed on the note that the consumer signs at closing.

35.     The third and fourth options allow the consumer to make fully amortizing principal and interest payments on either a 30-year or 15-year term. The dollar amounts of these options are the third and fourth lowest payment options presented to the consumer. The amounts of the 30-year or 15-year payment typically are not disclosed on the note that the consumer signs at closing.

36.     During the Initial Period, the Pay Option ARM has a negative amortization cap, commonly 115 percent or 120 percent of the original principal of the loan. Accordingly, if the principal balance exceeds the cap during the Initial Period, the consumer's monthly payment is immediately increased to be sufficient to repay the interest that has accrued on the principal balance of the loan at the Initial Stated Interest Rate. This payment will be the consumer's new "minimum payment" during the Initial Period. This can cause a substantial jump in the payment amount, which is often called "payment shock."

37.     After the Initial Period expires at the fifth year, the consumer's interest rate will become an adjustable interest rate and may change at that time and every month thereafter until maturity. Like the Hybrid ARM, the consumer's new interest rate is determined by adding a margin—usually 3 percent or higher—to an index rate, generally the LIBOR or the Monthly Treasury Average ("MTA"). The MTA index is the 12-month average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board.

38.     In addition, at the fifth year, the consumer's monthly payments will change to reflect the changed interest rate. At that time and every month thereafter until the tenth year, the payment is typically an interest-only payment based on the adjustable interest rate. At the tenth year, the consumer's payment will change again. At that time and every month thereafter until

maturity, the payment will be sufficient to repay the principal balance of the loan plus accumulated interest based on the adjustable interest rate. These changes can cause an even more severe payment shock.

39.     Pay Option ARMs frequently come with significant prepayment penalties, which can inhibit the consumer's ability to refinance the loan.

40.     Source Lending deceived consumers into refinancing by misleading them about the terms of the Pay Option ARMs. Source Lending deceptively marketed the Pay Option ARM by aggressively promoting the teaser rate. Source Lending did not effectively distinguish between the "payment rate" and the "interest rate" on the loans, and any warnings about potential negative amortization were buried in densely written small print. Consumers, enticed by low teaser rates, were easily distracted from the fine print in the loan documents and did not fully understand the terms or the financial implications of the Pay Option ARMs. Source Lending misrepresented or obfuscated the true terms of the Pay Option ARMs, including but not limited to misrepresenting or obfuscating the fact that the payment rate was not the interest rate and the risk of negative amortization.

41.     When a consumer obtained a Pay Option ARM from Source Lending, the initial monthly payment amount that appeared in his or her note was the minimum payment amount. Thus, a consumer typically would not know the exact monthly payment necessary to make a payment that would, for example, cover accruing interest, until he or she received the first monthly statement, which was well after the loan documents were signed.

42.     Like with the Hybrid ARMs, some borrowers subjected to the false, misleading, and deceptive acts and practices described above did not understand the true risks and likely unaffordability of their Pay Option ARMs, because Source Lending arranged for closings where

borrowers often had to sign a large stack of closing documents without enough time to review and understand them.

**B.      Source Lending Engaged in Unlawful "Bait-and-Switch" Techniques.**

43.     Source Lending routinely engaged in the classic "bait-and-switch" technique to deceive consumers into refinancing.

44.     Source Lending would "bait" consumers into refinancing by advertising a relatively favorable set of loan terms or features (e.g., a low fixed interest rate; a certain amount of cash at closing; or no payment of closing costs).

45.     Source Lending then "switched" to a relatively less favorable set of loan terms or features at closing (e.g., a high variable interest rate; less cash at closing; or payment of closing costs).

46.     Source Lending failed to clearly and conspicuously inform the consumer of the actual terms or features of the loan until the eve of closing or at the closing, if at all.  Source Lending's disclosures, if made, typically came after the consumer had acted to his or her detriment in reliance on closing on the loan that Source Lending originally represented.  For instance, Source Lending commonly told consumers not to pay their existing residential mortgage loan, because the loan payments would be paid at closing.  Consumers acted on Source Lending's advice, fell behind on their payments, and then felt pressured to close with Source Lending to make up the missed payment(s).

47.     If a consumer was able to figure out at or before closing that Source Lending had switched the loan terms, Source Lending commonly overcame the consumer's concerns by promising that they would be able to refinance into a loan with more affordable terms at a later date.

**C.      Source Lending Falsely Promised Serial Refinancing.**

48.      Source Lending mislead consumers into refinancing by making false promises of serial refinancing.

49.      Source Lending convinced some consumers to close on loans by falsely promising that the consumer could refinance the loan again before the first refinancing became unaffordable.   Source Lending would tell consumers that the initial refinancing was only "temporary" and that a future refinancing would have better loan terms.

50.      Source Lending encouraged consumers to refinance their loans by telling consumers that the first refinancing would boost their credit scores and thus enable the consumer to obtain future refinancing on better terms.   Source Lending also encouraged consumers to refinance by telling consumers that Source Lending would not charge them any fees for the future refinancing.

51.      Source Lending's false promises of serial refinancing were deceptive and misleading.

52.      Source Lending misled consumers into believing that Source Lending could provide the future refinancing.   Source Lending failed to fully and conspicuously disclose the foreseeable risk that Source Lending could not obtain the future refinancing and that consumers would be stuck with the first refinancing.   Source Lending knew or should have known and failed to disclose that it could not control whether a lender would agree to fund a future refinancing.

53.      Due to Source Lending's failure to perform as promised, consumers found themselves either stuck in the initial high variable interest loan or forced to refinance to another high variable interest loan.   For those consumers that Source Lending did refinance a second or

third time, Source Lending would not honor its promise not to charge consumers fees for the second or third refinancing.

## D.    Illustrative Examples of Source Lending's Unlawful Conduct.

54.    The following are illustrative, but non-exclusive, examples of Source Lending's unlawful practices:

### J.B.

55.    J.B. and her husband B.B. own a home in Ramsey, Minnesota. In the summer of 2004, the Bs were in the process of planning their wedding, which was to be in October, 2004. To pay for their wedding, the Bs needed to take some money out of their home by refinancing their residential mortgage loan. The Bs received a call from a telemarketer from Source Lending, who said that Source Lending could refinance their home loan and quoted them a 5% interest rate. A few days later, the Bs received a call from Eric Partyka from Source Lending. The Bs told Mr. Partyka that they needed the refinancing soon, because they were getting married in October and needed money to pay for their wedding. Soon thereafter, Mr. Partyka came to the Bs' home to discuss the refinancing. The Bs told Mr. Partyka that they wanted a 20- or 30-year fixed interest rate and approximately $6,000 out in cash to pay for their wedding. A few days later, after J.B. repeatedly attempted to reach Mr. Partyka without success, Mr. Partyka called and told the Bs that he had them "locked" at a 6.5% interest rate. The Bs naturally assumed that this was a fixed interest rate, because they told Mr. Partyka that they wanted a fixed interest rate and he did not tell them otherwise. On September 13, 2004, the Bs closed on the refinancing at Source Lending's office in Brooklyn Park, Minnesota. The Bs had not seen the closing papers before closing and they were not given the opportunity at closing to read them in detail. About half-way through the closing, the Bs were handed papers containing the loan

terms, which said that the loan had a fixed interest rate at 6.5% for 2 years and then it would

adjust after that. The Bs were stunned and told Mr. Partyka that the interest rate was supposed to

be fixed for the entire term of the loan. Mr. Partyka told the Bs for the first time that their credit

was not good enough to get a fixed interest rate. Mr. Partyka promised that if the Bs signed this

loan, Source Lending would refinance them again in two years to a loan with a 30-year fixed

interest rate and Source Lending would not charge them any closing costs. Mr. Partyka assured

them that this was a temporary solution to get their credit to where it needed to be. In addition,

Mr. Partyka explained that the Bs' payments would only go up $50 per month when the interest

rate adjusted. While it was not the loan that they wanted, the Bs agreed to close because they felt

they had no other choice and needed the loan to pay their wedding costs. In October, 2006, the

interest rate on the Bs' loan adjusted and their payment went up approximately $300 per month,

not $50 per month as Mr. Partyka said it would.

### L.C.

56.    In June, 1996, L.C. took out a residential mortgage loan and bought a home in

Maple Grove, Minnesota. Between 2003 and 2005, L.C. became very sick and could not work,

which caused her to be in a very difficult financial position. In the summer of 2005, L.C.

received a call from a representative of Source Lending named Shannon Roepke. Mr. Roepke

told L.C. that Source Lending could help her refinance her loan and she could get cash out of the

refinancing to pay off bills. L.C. specifically told Mr. Roepke that she did not want an ARM,

because she knew that ARMs adjusted and she wanted certainty in her loan payments. Mr.

Roepke told L.C. that Source Lending would refinance her home loan once and her credit would

improve, and then six months to a year later Source Lending would refinance her home loan a

second time with better terms. Mr. Roepke also told L.C. that there would be no closing costs

for the first refinancing. Moreover, Mr. Roepke convinced L.C. not to pay her existing home loan and thus backed her into a corner where she felt she had no choice but to refinance with Source Lending. In the end, Source Lending sold L.C. an ARM, despite the fact that L.C. specifically told Source Lending she did not want an ARM. Moreover, Source Lending never fulfilled its promise to refinance L.C. a second time with better terms. Finally, Source Lending charged L.C. $2,462 in total closing costs (of which $662 was paid to Source Lending), despite telling L.C. that she would not have to pay any closing costs. L.C.'s ARM is set to adjust in September, 2008, and she is afraid that she will not be able to afford her new payment and that she will be forced to try and sell her home if she cannot refinance before then.

### K.D.

57.    In 2001, K.D. and her husband B.D. took out a residential mortgage loan and purchased a home in West St. Paul, Minnesota. In late 2005 or early 2006, the Ds faced some financial difficulties due to K.D.'s job loss. In January, 2006, the Ds received a call from a Source Lending representative named Joe about refinancing their loan. The Ds told Joe that they wanted an interest rate at around 7 or 8 percent; a first payment due date of May 1, 2006; and an escrow account for taxes and insurance. When the closing occurred on a Friday night, however, the loan Source Lending had obtained contained none of these features. In addition, the Ds were expecting $8,000 or $9,000 in cash at the refinancing, but the loan only funded $4,000. The Ds called Joe (who was not present at closing) to tell him that the loan did not contain the terms they wanted. Joe told the Ds to sign the closing papers anyway and that Joe would prepare correct closing papers for them to sign on the following Monday. Aware of the 3-day right of rescission, but assured by Joe's promise that he would prepare correct closing papers on Monday, the Ds closed on the loan. When the Ds called Joe on the following Monday to ask about the correct

17

papers, Joe told them that he was working on it. The Ds called Joe again on Monday and on the following Tuesday, but Joe did not answer or return their calls. Joe never prepared the correct closing papers as he had promised. As a result of Joe's false promises and misrepresentations, the Ds were stuck in a loan that did not contain the features they had told Source Lending they wanted. Ultimately, the Ds were unable to make payments on their loan and were forced to move out and sell their home.

<u>S.M.</u>

58.    In March, 2005, S.M. and her husband Z.M. bought their home in St. Paul, Minnesota. The Ms financed their home by taking out two residential mortgage loans. In the summer of 2006, the Ms received a call from a representative of Source Lending named Andrew Benson. Mr. Benson told the Ms that the interest rate on one of their existing loans was going to adjust soon and Source Lending could help them get a better loan. Z.M. told Mr. Benson that they wanted a 30-year fixed interest rate and they wanted to consolidate their two home loans. Mr. Bennett assured them that Source Lending could consolidate their two loans into one loan that would have a lower, fixed interest rate. Later that same week, Mr. Benson came to the Ms' home to discuss refinancing. Mr. Benson told them that Source Lending could obtain a loan for them with an interest rate of 6.25% to 6.5%. Mr. Benson again assured them that Source Lending could consolidate their two home loans into one. Sometime thereafter, however, Mr. Benson called and told the Ms that Source Lending could not consolidate their two home loans into one loan. But Mr. Benson promised that Source Lending would refinance the Ms again in two years and at that time their credit would improve enough so that Source Lending could get them one home loan with a 30-year fixed interest rate. At some point, Mr. Benson also told the Ms not to pay their existing home loan, because that loan would be paid off with the refinancing.

The Ms trusted Mr. Benson and followed his advice not to make their payment. On September 1, 2006, the Ms closed on their refinancing with Source Lending. The closing took place at Source Lending's office in Brooklyn Park, Minnesota. Source Lending made the Ms wait four hours before starting the closing, because Mr. Benson was still "running off papers" and was supposedly waiting for some documents to come in from the lender. The Ms had not seen any of the closing documents before closing. Yet Mr. Benson and the closer rushed through the documents, telling the Ms where to sign but never really explaining the documents in any detail. The Ms learned for the first time at closing that the interest rates on their loans were much higher than Source Lending had promised. Mr. Benson had told them that their interest rate would be between 6.25% and 6.5%, but the actual interest rate was 7.25% on one loan and 9.55% on the other. When the Ms confronted Mr. Benson about this, Mr. Benson said that he could not get them a 6.25% or 6.5% interest rate, but that Source Lending would refinance them again in two years to a lower rate. The Ms also learned at closing that one of the loans would have an adjustable interest rate with interest-only payments for the first five years. When the Ms confronted Mr. Benson about this, Mr. Benson told them that all adjustable rate loans have interest-only payments during the first five years. The Ms felt that they had no choice but to go ahead and refinance with Source Lending, because they had not made payments on their existing home loan based on Source Lending's advice. They did not want a late payment on their loan, which they were concerned would be reported on their credit report and ruin their credit. It also would have been a financial hardship for them to make up the back loan payments for the month they skipped and for the current month.

### B.M. and L.C.-M.

59.     In 2005, B.M. and L.C.-M. took out two residential mortgage loans and purchased a home in Brooklyn Park, Minnesota.  In the Spring of 2007, L.C-M. needed to have major surgery that required her to miss six weeks of work.  The Ms knew they would have trouble meeting their financial obligations, including their loan payments, for at least one month. Because of this, and because one of their loans was an interest-only loan, the Ms felt it would be a good time to refinance.  In late April or early May of 2007, the Ms started communicating with a Source Lending representative named Michael Stark.  The Ms told Mr. Stark that they wanted a 30-year fixed rate loan, but Mr. Stark steered them towards what he called an "option" loan.  Mr. Stark said that the interest rate on the "option" loan would be lower than the Ms' existing interest rate of 6.125%.  Mr. Stark also said that the interest-only payments on the "option" loan would be $1,200 per month, which included taxes and insurance.  Despite their reservations, the Ms agreed to the "option" loan.  At closing, the Ms were hurried to sign the papers without having the documents explained to them.  Contrary to Mr. Stark's representations, the interest rate on the loan was 8.875%, which was more than 2.5% higher than the Ms' original loan.  In addition, the $1,200 figure Mr. Stark quoted was not, in fact, the interest-only payment, but was instead the "minimum payment," which would not even cover the interest accruing on the loan balance.

### B.P.

60.     In 2002, B.P. took out a residential mortgage loan and purchased a home in Lakeville, Minnesota.  In approximately February, 2007, B.P. was contacted by a Source Lending telemarketer about refinancing the loan and agreed to speak with a Source Lending mortgage broker named Brad Kessel.  Mr. Kessel manipulated and mislead B.P in several ways. Mr. Kessel told B.P. not to make his loan payments, claiming that he was working with B.P.'s

then-current mortgage company. B.P. followed this advice, but later learned that Mr. Kessel had not been working with his mortgage company and that the mortgage company reported his delinquency to the credit bureaus. Mr. Kessel also promised B.P. a second home loan in addition to refinancing his existing home loan, but Source Lending never provided B.P. with a second loan. Mr. Kessel further promised B.P. $2,000 in cash at closing, but B.P. only received $1,250. In addition, Mr. Kessel told B.P. that the loan had a 2.375% interest rate, but the interest rate is actually 8.875% and the 2.375% figure is the payment rate used to determine the minimum payment. Moreover, Mr. Kessel told B.P. that he could pay down his loan if he made ten "minimum payments" and two "15 year" payments, but this payment plan would not even pay the interest on loan. Mr. Kessel never explained that the principal balance could go up on the loan. Finally, Mr. Kessel said he was not going to make money on the refinance, but Source Lending charged B.P. $3,127 for the refinancing.

### B.P.

61.      B.P. and J.P., who are 73 and 74 respectively, owned their home in St. Paul, Minnesota for 42 years. B.P. has been a homemaker for about the past 30 years. J.P. is a retired master electrician and Korean War veteran and he suffers from diabetes and needs the use of a wheelchair to get around. In mid-2005, the Ps started receiving telephone calls from a Source Lending representative, who said that Source Lending could lower their home loan payments by $100 or $200 per month. Shortly thereafter, a Source Lending representative named Nathan Smedja came to the Ps' home to talk about refinancing. J.P. told Mr. Smedja that the Ps wanted a fixed interest rate loan and did not want an ARM. Mr. Smedja told the Ps that if they refinanced with Source Lending, they would get a fixed interest rate loan, their loan payments would be reduced by $100 per month, and they would receive $10,000 in cash at closing. During

the closing, Mr. Smedja shielded the paperwork to show the Ps only where to sign their names. Mr. Smedja did not explain the papers to the Ps and left without giving the Ps copies. The next day, Mr. Smedja came to the Ps' home and gave them unsigned copies of the closing documents. It was then that the Ps first realized that their loan was an ARM. The Ps paid Source Lending $6,655 in fees, but they did not get the fixed interest rate, the $100 lower monthly payments, or the $10,000 in cash that Source Lending had promised. Had they known they would pay so much in fees but not get the loan they were promised, the Ps would have never agreed to refinance with Source Lending. Ultimately, the Ps had trouble making their loan payments. Their home went into foreclosure and they ended up losing their home. The Ps moved out in February, 2008, and they are currently renting a small apartment.

### C.W.

62.     In 1999, C.W. and her husband R.W. took out a residential mortgage loan and built a home in Buffalo, Minnesota. Beginning in 2000, the Ws faced some financial difficulties due to medical expenses and the loss of both C.W.'s and R.W.'s jobs. In February, 2006, the Ws received a call from a Source Lending representative named Bob about refinancing their loan. The Ws were desperate for help, so they agreed to meet with a representative from Source Lending. Shortly thereafter, a Source Lending representative named Vaughn Coleman came to their home to discuss refinancing. Mr. Coleman said that Source Lending would put them on a "3-step program." Mr. Coleman explained that Source Lending would refinance them once and their credit would improve; then Source Lending would refinance them a second time to a better loan and their credit would further improve; and then Source Lending would refinance them a third time to a fixed rate loan. Mr. Coleman told them not to worry about the first and second refinances, because they would be "temporary" and just a "band-aid loan." Ultimately, the Ws

refinanced their residential mortgage loan three times with Source Lending (February, July, and November, 2006), but Source Lending never provided them with a fixed rate loan as promised. Moreover, despite Mr. Coleman's promise not to charge the Ws any closing costs after the first refinance, the Ws paid Source Lending a total of $6,548 for the second and third refinances. This process has hurt the Ws financially.

R.W.

63.    Since 2000, R.W. and his wife, J.W., have lived in their home with their 15-year-old daughter and their medically challenged 8-year-old son. Over the years, the Ws have worked very hard to make their home accessible for their son, such as installing a ramp for their son's wheelchair and replacing the carpet with hardwood to help deal with their son's allergies. In the last several years, the Ws became interested in refinancing their residential mortgage loan, because they had heard that interest rates were low and they wanted to pull money out of their home to pay medical bills. The Ws refinanced their loans with Source Lending on four occasions (August, 2004; February, 2006; July, 2006; and October, 2006). With respect to the August, 2004, refinance, Source Lending obtained a loan with an adjustable interest rate starting at 7.6%, but Source Lending told the Ws not to worry, because Source Lending would refinance them again to a fixed interest rate before the rate adjusted. With respect to the February, 2006, refinance, Source Lending told the Ws that Source Lending could get them a better deal if they took out two loans. While one of the loans had an adjustable interest rate starting at 8.28% (which was higher than the previous loan) and had initial interest-only payments, Source Lending assured the Ws that Source Lending would refinance them to a fixed interest rate loan the next time. With respect to the July, 2006, refinance, Source Lending told the Ws that Source Lending could improve their finances by consolidating their two loans into one loan, but the one

23

loan that Source Lending obtained had a fixed interest rate of 8.74%, which was higher than the previous loan.   With respect to the October, 2006, refinance, Source Lending, through its representative, Vaughn Coleman, assured the Ws that Source Lending could obtain a loan with a better interest rate and stressed that if the Ws paid a certain amount per month, they could pay the loan off 5 years sooner than their existing loan and R.W. could retire 5 years earlier than he had planned. The Ws learned at closing, however, that the interest rate on the loan would be adjustable.   When they questioned Source Lending about the adjustable interest rate, Source Lending told them that Source Lending would get them out of the adjustable rate before it adjusted.   The Ws also learned at closing that the loan would have interest-only payments for the first 5 years.   When they questioned Source Lending about this, Source Lending said that all adjustable rate loans have an interest-only period, usually for 2 years, but that this loan would be interest-only for 5 years.   In the months that followed, the Ws requested that Source Lending obtain for them a loan with a fixed interest rate as Source Lending had promised.   But Source Lending has not obtained such a loan for the Ws.   The Ws are now very concerned that they will not be able to afford their loan payments when the interest rate adjusts on their current loan. The Ws paid thousands of dollars in fees to Source Lending to refinance their loans, but they did not end up with the fixed interest rate loan that they wanted and Source Lending promised to get for them.

## COUNT I
## PREVENTION OF CONSUMER FRAUD ACT

64.      Plaintiff re-alleges all prior paragraphs of this Amended Complaint.

65.      Minn. Stat. § 325F.69, subdivision 1 (2006) provides:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise,

whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

66.     Defendants' conduct described above constitutes multiple, separate violations of Minn. Stat. § 325F.69, subd. 1, including but not limited to:

a.     Statements that the interest rate on a residential mortgage loan was fixed when it was variable;

b.     Statements that the interest rate on a residential mortgage loan was lower than it actually was;

c.     Statements that the monthly payment on a residential mortgage loan was fixed when it was variable;

d.     Statements that the monthly payment on a residential mortgage loan was lower that it actually was;

e.     Statements that the monthly payment on a residential mortgage loan paid interest and principal when the payment only paid the interest;

f.     Statements that the consumer would receive a higher amount of cash out of the refinancing than the consumer actually received;

g.     Statements that the consumer would not pay closing costs or fees when the consumer was charged such costs and fees;

h.     Statements that consumers should not pay their existing residential mortgage loans;

i.     Statements regarding the terms and payment obligations of Hybrid ARMs, including statements focusing on the initial low interest rates and/or monthly payments, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such loans;

j.      Statements regarding the terms and payment obligations of Pay Option ARMs, including statements focusing on the initial low interest rates and/or monthly payments, statements that the initial payment rate was the interest rate, and statements obfuscating the risks associated with such loans; and

k.      Statements regarding serial refinancing, including false promises of serial refinancing, statements that consumer should not worry about their "temporary" refinancing because the loan could be refinanced before it became unaffordable, false promises that consumers would not be charged closing costs or fees for future refinances, statements regarding the consumer's ability to obtain future refinancing, statements regarding Source Lending's ability to secure future refinancing for consumers, and statements obfuscating the risks associated with serial refinancing.

## COUNT II
## UNIFORM DECEPTIVE TRADE PRACTICES ACT

67.   Plaintiff re-alleges all prior paragraphs of this Amended Complaint.

68.   Minn. Stat. § 325D.44, subdivision 1 (2006) provides, in part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

(5)   represents      that      goods     or     services have...characteristics...benefits...that they do not have...

(7)   represents that goods or services are of a particular standard, quality, or grade...if they are of another;...

(9)   advertises goods or services with intent not to sell them as advertised...

(13)   engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

a.    Defendants' conduct described above constitutes multiple, separate

violations of Minn. Stat. § 325D.44, subd. 1, including but not limited to the conduct

identified in paragraph 66 above.

## COUNT III
## FALSE ADVERTISING ACT

69.    Plaintiff re-alleges all prior paragraphs of this Amended Complaint.

70.    Minn. Stat. § 325F.67 (2006) provides, in part, that:

Any person, firm, corporation, or association who, with intent to sell or in
anywise dispose of merchandise, securities, service, or anything offered by such
person, firm, corporation, or association, directly or indirectly, to the public, for
sale or distribution, or with intent to increase the consumption thereof, or to
induce the public in any manner to enter into any obligation relating thereto, or to
acquire title thereto, or any interest therein, makes, publishes, disseminates,
circulates, or places before the public, or causes, directly or indirectly, to be made,
published, disseminated, circulated, or placed before the public, in this state, in a
newspaper or other publication, or in the form of a book, notice, handbill, poster,
bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or
television station, or in any other way, an advertisement of any sort regarding
merchandise, securities, service, or anything so offered to the public for use,
consumption, purchase, or sale, which advertisement contains any material
assertion, representation, or statement of fact which is untrue, deceptive, or
misleading, shall, whether or not pecuniary or other specific damage to any
person occurs as a direct result thereof, be guilty of a misdemeanor, and any such
act is declared to be a public nuisance and may be enjoined as such.

71.    Defendants' conduct described above constitutes multiple, separate violations of

Minn. Stat. § 325F.67, including but not limited to:

a.    Statements made on Source Lending's Internet website claiming that

Source Lending could save consumers "more than $200 dollars" on their monthly

payments, will "always be available," will "explain things in a simple, straight forward

way that is easy to understand," could obtain a loan "for every situation," and could

create a loan program "regardless of [the consumer's] credit situation"; and

b.       Statements made in Source Lending's direct mailing to members of Twin

City Co-ops that were clearly meant to deceive Twin City Co-ops members into thinking

it came from Twin City Co-ops and deceptively designed to look as if Twin City Co-ops'

members would receive some kind of deal "because you are a previous customer."

### COUNT IV
### MINNESOTA RESIDENTIAL MORTGAGE ORIGINATOR
### AND SERVICES LICENSING ACT

72.     Plaintiff re-alleges all prior paragraphs of this Amended Complaint.

73.     Minn. Stat. § 58.13, subd. 1 (2006) provides, in part:

(a)  No person acting as a residential mortgage originator or servicer, including a
person required to be licensed under this chapter, and no person exempt from the
licensing requirements of this chapter under section 58.04, except as otherwise
provided in paragraph (b), shall:...

> (6) charge a fee for a product or service where the product or service is not
> actually provided, or misrepresent the amount charged by or paid to a third
> party for a product or service;...

> (9) make or cause to be made, directly or indirectly, any false, deceptive,
> or misleading statement or representation in connection with a residential
> loan transaction including, without limitation, a false, deceptive, or
> misleading statement or representation regarding the borrower's ability to
> qualify for any mortgage product;...

> (19) make, publish, disseminate, circulate, place before the public, or
> cause to be made, directly or indirectly, any advertisement or marketing
> materials of any type, or any statement or representation relating to the
> business of residential mortgage loans that is false, deceptive, or
> misleading....

74.     A "residential mortgage originator" includes a mortgage broker. *See* Minn. Stat.

§ 58.02, subd. 19.

75.     Defendants' conduct described above constitutes multiple, separate violations of

Minn. Stat. § 58.13, subd. 1, including but not limited to the conduct identified in paragraphs 66

and 71 above.

## RELIEF

WHEREFORE, the State of Minnesota, by its Attorney General, Lori Swanson, respectfully asks this Court to award judgment against Defendants as follows:

1.      Declaring that Defendants' acts described in this Amended Complaint constitute multiple, separate violations of Minn. Stat. §§ 325F.69, subd. 1; 325D.44, subd. 1; 325F.67; and 58.13, subd. 1;

2.      Enjoining Mr. Hacker and Source Lending and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert of participation with it, from engaging in mortgage origination, including mortgage brokering, in violation of Minn. Stat. §§ 325F.69, subd. 1; 325D.44, subd. 1; 325F.67; and 58.13, subd. 1;

3.      Awarding judgment against Defendants for civil penalties pursuant to Minn. Stat. §§ 8.31, subd. 3, for each separate violation of Minn. Stat. §§ 325F.69, subd. 1; 325D.44, subd. 1; 325F.67; and 58.13, subd. 1;

4.      Awarding judgment against Defendants for restitution under the *parens patriae* doctrine, the general equitable powers of this Court, Minn. Stat. § 8.31 and any other authority, for all persons injured by Source Lending's acts described in this Amended Complaint;

5.      Awarding Plaintiff its costs, including costs of investigation and attorneys fees, as authorized by Minn. Stat. § 8.31, subd. 3a; and

6.      Granting such further relief as provided by law and/or as the Court deems appropriate and just.

Dated:   2/12/09

Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota

JEFFREY J. HARRINGTON
Assistant Attorney General
Atty. Reg. No. 0327980

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 297-2730 (Voice)
(651) 297-7206 (TTY)

ATTORNEYS FOR PLAINTIFF
STATE OF MINNESOTA

## MINN. STAT. § 549.211
## ACKNOWLEDGMENT

The party on whose behalf the attached pleading is served acknowledges through its undersigned counsel that sanctions, including reasonable attorneys fees and other expenses, may be awarded to the opposite party pursuant to Minn. Stat. § 549.211 (2006).

Dated: _2/12/09_

JEFFREY J. HARRINGTON
Assistant Attorney General
Atty. Reg. No. 0327980

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 297-2730 (Voice)
(651) 297-7206 (TTY)

ATTORNEY FOR PLAINTIFF
STATE OF MINNESOTA

**Plymouth Office: 3033 Campus Drive, Suite E170, Plymouth, MN 55441**



Outsourced I.T. Services by Computer Zone Consulting Inc.



6/17/2008



## SERVICES

*Whether purchasing your first home or refinancing,*
**Source Lending Corporation can customize the
perfect loan program to meet your financial goals.**

Regardless of your credit situation we can help you:

- Pay off credit cards
- Lower your monthly payments
- Get cash out for home improvements or take that vacation you always wanted to
- Build equity faster
- Improve your credit scores
- Consolidate your first and second mortgage
- Remove mortgage insurance
- Increase your tax deductibility

Due to the wide variety of loan programs we can create for you, we recommend you contact one of our experienced account executives, we will help you find a solution to your needs. We will always be available to you and we will explain things in a simple, straight forward way that is easy to understand.

For a no cost, no obligation solution, underline contact us.

### INTEGRITY & EXPERIENCE

- Others may tell you what you want to hear - we offer sound expertise
- Long term planning & vision nurture loyal customers with evolving needs

### DID WE CALL YOU?

Most of our customers do not realize they could be in a stronger financial position - we offer a free, in-home consultation based on your wants and needs. 9 out of 10 people we talk to can save more than $200 dollars on their current monthly payments.

With so many lending opportunities, it comes down to **service**. Let a Source Lending professional **come to your home** and consult you based on what's best for **your future**

### NO STRESS WITH THE BEST

online form



## ABOUT US



**Source Lending Corporation has arrived.**

We are committed to one thing: *doing everything better than everyone else.*

All members of our staff are highly trained, assertive, creative, problem solvers. We will never quit until we have structured the perfect loan program to meet every one of your financial goals.

Source Lending has hundreds of loan programs for every situation. We specialize in fast, hassle free closings. We will come to your home or work twenty four hours a day, seven days a week to discuss your financial needs and find a solution. We can even close your loan in your home from 8a.m. until midnight.

Due to the wide variety of loan programs we can create for you, we recommend you contact one of our experienced account executives, we will help you find a solution to your financial needs. We will explain things in a simple, straight forward way that is easy to understand.

For a no cost, no obligation solution, <u>contact us</u>.

# SOURCE LENDING CORPORATION

ABOUT US

WHY PURCHASE

SERVICES

CONTACT US

## WHY PURCHASE?

### INTEGRITY & EXPERIENCE

- Others may tell you what you want to hear – we offer sound expertise
- Long term planning & vision nurture loyal customers with evolving needs

### DID WE CALL YOU?

Most of our customers do not realize they could be in a stronger financial position – we offer a free, in-home consultation based on your wants and needs. 9 out of 10 people we talk to can save more than $200 dollars on their current monthly payments.

With so many lending opportunities, it comes down to **service**. Let a Source Lending professional **come to your home** and consult you based on what's best for **your future**.

### NO STRESS WITH THE BEST

online form

**Purchasing a home is one of the smartest moves you can make to strengthen your financial position while enjoying all the benefits of home ownership.**

With the variety of loan programs, Source Lending can create for you there is no need to worry about not having enough money for a down payment or having a higher payment than what you currently pay for rent.

We have programs that allow you to purchase a home with little or no money down. We can create a loan program that will give you the payment you want, regardless of your credit situation.
The best part is virtually your entire mortgage payment can be a tax deduction and you begin building equity from day one. Why pay rent when you can have about the same payment, build equity and have greater tax deductibility.

Source Lending has strategic alliances with title companies, appraisers and real estate agents and financial advisors, we have everything you need to purchase your home quickly and easily. Remember we are available to meet with you 24 hours a day, 7 days a week.

For a no cost, no obligation solution, underline contact us.

www.sourcelending.net/whypurchase.htm

6/17/2008



# SOURCE LENDING CORPORATION

ABOUT US
WHY PURCHASE
SERVICES
CONTACT US

## CONTACT US

**ymouth Office:**
I33 Campus Drive, Suite E170
ymouth, MN 55441
fice: 763-746-2320
x: 763-746-2370
nail: **slmarketing@sourcelending.net**



### Plymouth Office Directions

Located in the Atria building, on the northeast corner of Hwy 55 and Hwy 494

Go to mapquest.com for more detailed directions.

## INTEGRITY & EXPERIENCE

• Others may tell you what you want to hear - we offer sound expertise

• Long term planning & vision nurture loyal customers with evolving needs

## DID WE CALL YOU?

Most of our customers do not realize they could be in a stronger financial position - we offer a free, in-home consultation based on your wants and needs. 9 out of 10 people we talk to can save more than $200 dollars on their current monthly payments.

With so many lending opportunities, it comes down to **service**. Let a Source Lending professional **come to your home** and consult you based on what's best for **your future**.

## NO STRESS WITH THE BES

online form

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In Re:

CHRISTOPHER HACKER,                                        Case No. 09-45742

                                                               Chapter 7

        Debtor.

## PROOF OF SERVICE

    I HEREBY CERTIFY that on this __24th__ day of October 2011, the

### THE STATE OF MINNESOTA'S
- **ADVERSARY COMPLAINT against Christopher Hacker asf Source Lending Corporation; and**
- **AFFIDAVIT OF IAN DOBSON**

were electronically filed with the Clerk of the Bankruptcy Court using the ECF system which will send notification of the electronic filing to:

- Barbara J. May        babsjmay@aol.com
- Julia A. Christians      jchristians@lapplibra.com
- U.S. Trustee           ustpregion12.mn.ecf@usdoj.gov

    IT IS FURTHER CERTIFIED that on this __24th__ day of October 2011, service of the foregoing documents have been made on the following non-ECF participants by depositing a copy thereof in the U.S. mail, postage prepaid, and addressed to each as follows:

Christopher Hacker                Brian Leonard
Source Lending Corporation      Leonard, O'Brien, Spencer, Gale & Sayre LTD
6915 Dylan Lane                 100 South Fifth Street, Suite 2500
Independence, MN 55359        Minneapolis, MN 55402

John R. Neve, Esq.
Neve & Associates, PLLC
8500 Normandale Lake Blvd.
Suite 1080
Minneapolis, MN 55437

Dated:  October 24, 2011                    LORI SWANSON
                                            Attorney General
                                            State of Minnesota


                                            s/Ian Dobson_____
                                            IAN DOBSON
                                            Assistant Attorney General
                                            Atty. Reg. No. 0386644

                                            445 Minnesota Street, Suite 1400
                                            St. Paul, Minnesota 55101-2131
                                             (651) 757-1432 (Voice)
                                            (651) 297-7206 (TTY)

                                            ATTORNEYS FOR MOVANT